IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

Civil Action No.: 1:13-cv-00007

| | | |
|---|---|---|
| MOOG MUSIC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| A.C. ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Moog Music, Inc. ("Moog Music") complains of the Defendant A.C. Entertainment, Inc. ("ACE" or "Defendant") as follows:

## NATURE OF ACTION

1.      This is a civil action seeking injunctive relief and damages against Defendant ACE for false advertising in violation of § 43(a) of the Lanham Act, codified as 15 U.S.C. § 1125(a), trademark infringement in violation of § 32 of the Lanham Act, codified at 15 U.S.C. § 1114, breach of contract or, in the alternative, unjust enrichment, tortious interference with prospective advantage, unfair and deceptive trade practices in violation of N.C.G.S. § 75-1.1, and common law unfair competition.

2.      Plaintiff Moog Music has held its annual "Moogfest" music festival since 2004 to celebrate the legacy of Moog Music's founder, Dr. Robert Moog.  Moogfest was conceived of by Moog Music, is the platform for Moog Music's presentation of its Moog Innovation Award, and is held in Asheville, where Moog Music has its headquarters and its Moog Sound Lab.

3.      Defendant ACE has promoted Moogfest for Moog Music under a Trademark License Agreement for the past three years.  In October 2012, Moog Music elected to terminate the License Agreement pursuant to which ACE promoted Moogfest.

4.    In response, ACE publicly declared that Moogfest is "its" festival, and engaged in a deliberate campaign to misappropriate the substantial goodwill built up around the MOOGFEST mark.  As part of this effort ACE issued a press release declaring that it was "renaming" "its" festival from Moogfest to the "Mountain Oasis Electronic Music Summit." ACE also unilaterally renamed both the Moogfest Facebook page and Moogfest Twitter account to the "MtnOasis" page and account, thus misappropriating thousands of Moogfest fans, followers and customers and the associated goodwill.  Moreover, ACE used, and continues to use, the "Moogfest.com" email mailing list to disseminate false and misleading statements to advertise and promote its competing Mountain Oasis Electronic Music Summit.

5.    ACE continues to make false and misleading public statements and representations in an effort to promote its new festival by trading on Moog Music's and Moogfest's goodwill.  Because of ACE's unfair and unlawful conduct, customers of Moog Music and Moogfest were and are confused, putting at risk the substantial goodwill that Moog Music and Moogfest have developed over many years.

## THE PARTIES

6.    Plaintiff Moog Music is a corporation formed and existing under the laws of the State of North Carolina.  Moog Music maintains its principal place of business in Asheville, North Carolina.

7.    Defendant ACE is a corporation formed and existing under the laws of the State of Tennessee.  ACE, upon information and belief, maintains its principal place of business at 507 S. Gay Street, Suite 1100, Knoxville, TN 37902.  ACE does business in North Carolina.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1138(a) and (b) because this action arises under the Lanham Act, and this Court has

supplemental jurisdiction over Moog Music's related state law claims pursuant to 28 U.S.C. § 1367(a).

9.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over ACE because ACE has conducted business in this State and District and has committed acts in this States and District that are the subjects of the claims set forth herein.

11.     Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391.

## MATERIAL FACTS

### *Dr. Robert Moog and Moog Music*

12.     Dr. Robert Moog was the preeminent pioneer of electronic music.  He is widely credited with inventing and popularizing the electronic music synthesizer, thereby revolutionizing popular music.

13.     Dr. Moog's synthesizers have enjoyed international acclaim from the 1960s through the present.  Genre-defining musical acts such as The Beatles, the Rolling Stones, Stevie Wonder, Pink Floyd, Parliament Funkadelic, and Kraftwerk used Moog Music synthesizers to create the soundtrack to the second half of the 20th Century.

14.     Today, almost sixty years later, Moog Music instruments help create the sound of the new millennium in the hands of innovative artists like Daft Punk, MGMT, Gorillaz, Radiohead, and U2, to name a few.

15.     Dr. Moog remains an icon among musicians world-wide for his unique combination of technical brilliance, creative curiosity, and generosity of spirit.  His substantial achievements are recounted by documentary filmmaker/musician Hans Fjellestad in the full

length feature documentary film, *Moog*, which plays regularly to this day on the BBC and is a popular documentary on Netflix.

16. In 2002, the National Academy of Recording Arts and Sciences presented Dr. Moog with a Technical GRAMMY award. The GRAMMY award reads: "To Robert Moog whose early development of analog electronic instruments made his name synonymous with the synthesizer and ultimately helped spawn the electronic music revolution of the 80's and 90's."

17. Dr. Moog's legacy was recently recognized and celebrated world-wide when Google created the Moog Google Doodle on May 23rd, 2012, in honor of Dr. Moog's 78th birthday.

18. Although Dr. Moog passed away in August of 2005, his enormous legacy still resonates, and is carried forward through Plaintiff Moog Music, which he originally founded in 1954 under the name R.A. Moog.

19. Moog Music continues to be the leading producer of synthesizers, analog musical instruments, and effects pedals, and its world-wide reputation is intertwined with the legacy of its founder, Dr. Moog. By virtue of Dr. Moog's legacy and the synthesizers that Moog Music develops, Moog Music enjoys tremendous goodwill among fans and customers of electronic music-related products.

20. Moog Music owns significant common law rights in and federal trademark registrations for the MOOG mark in connection with a variety of goods and services, including, without limitation, U.S. Reg. No. 3,465,771 in connection with "[e]lectronic musical keyboards; music synthesizers; theremins and musical instruments in general" and "[s]ound frequency filters for controlling audio parameters by raising or lowering the gain of specific audio frequencies using a multiple resonant filter array and animating those frequencies using a built-in pattern

generator", and U.S. Reg. No. 3,875,522 in connection with "[t]-shirts, tank tops, jerseys, hooded sweat shirts, head wear, hats".

21.     Moog Music also owns significant common law rights in and federal trademark registrations and applications for other marks in its family of Moog marks, including, without limitation, MOOG MUSIC, INC. (U.S. Reg. No. 2,473,815); THE MOOG STORE (U.S. Reg. No. 4,258,793); ANIMOOG (U.S. Reg. No. 4,258,793); and MINIMOOG (U.S. Reg. No. 2,487,737), all for a variety of goods and services related to electronic music.

*Moogfest*

22.     In 2004, Moog Music conceived the idea for a "Moogfest" music festival as a forum in which to celebrate Dr. Moog and his influence in the world of electronic and popular music.

23.     From 2004 through 2008, Moogfest was held at BB King's Club in New York City.  Starting in 2005 and continuing as recently as the 2012 Moogfest, the annual Moog Innovation Award (originally called "The Bob") was awarded during Moogfest.

24.     In addition to the marks listed above, among others, Moog Music owns a federal trademark registration for the mark MOOGFEST (U.S. Reg. No. 3,714,113) in connection with "entertainment, namely, live music festivals featuring synthesizer music and electronic musicians, and honoring Mr. Robert Moog; [and] providing an online website portal featuring information about music festivals, musical artists and music festival ticket information."

25.     In addition to celebrating Dr. Moog's legacy and perpetuating Moog Music's goodwill, Moogfest has had a positive commercial impact on Moog Music.  Moog Music's sales have experienced double digit growth since Moogfest's inception due, at least in part, to the success of Moogfest.

*Moog Music Contracts with ACE to Promote Moogfest*

26. Following the 2008 Moogfest in New York City, and in an attempt to further the celebration of Dr. Moog's legacy, Moog Music decided to contract with a professional music festival promoter to help Moog Music promote Moogfest in Asheville, North Carolina, where Moog Music is headquartered and where Dr. Moog spent much of his life.

27. Accordingly, Moog Music and ACE entered into Trademark License for Services Agreement, effective January 1, 2009 (the "License Agreement").

28. Generally speaking, the License Agreement permitted ACE to use the MOOGFEST mark to promote and market Moogfest. However, all intellectual property and associated rights remained the sole property of Moog Music, and were not transferred to ACE:

> "[ACE] recognizes and acknowledges that **the Mark and all rights therein and goodwill pertaining thereto belong exclusively to [Moog Music], that all rights resulting from its use of the Mark inure to the benefit of [Moog Music]**, and that [Moog Music] retains the right to use or to license the use of the Mark for any and all events, goods, or services it so desires …."

> (emphasis added)

29. The License Agreement requires that upon its termination, ACE must transfer to Moog Music the intellectual property associated with the MOOGFEST mark.

30. For example, the License Agreement provides expressly that upon the termination of the Agreement, ACE must "release any right it might have to the internet URL www.moogfest.net and www.moogfest.com."

31. The License Agreement makes clear that although ACE would promote the festival, Moogfest remained "an official Moog Music authorized event," the central purpose of which was to "recogniz[e] or celebrat[e] the achievement of [Moog Music's] founder, Robert A. Moog."

32. The License Agreement thus confirms that Moogfest was to remain a *Moog Music* festival – just as it always had been – and that ACE was to be the promoter only.

33. Since the inception of Moogfest, and during the term of the Licensing Agreement, Moog Music remained intricately involved with Moogfest and has overseen its production and ACE's use of the MOOGFEST Mark.

*ACE's Promotional Efforts using the MOOGFEST mark*

34. Pursuant to the License Agreement, ACE promoted Moogfest, which was held in Asheville, North Carolina in 2010, 2011, and 2012.

35. During that period, ACE promoted Moogfest using the MOOGFEST mark under the License Agreement.

36. As part of its promotional efforts, ACE used the Moogfest Facebook page (located at the URL www.facebook.com/moogfest).

37. A Facebook user may choose to "like" or "become a fan" of a particular page. By doing so, the user opts to connect to that page, which then appears in the user's profile. The user then receives updates regarding the page through status updates, link posts, event "invites", and via the user's news feed.

38. "Fans" of the Moogfest Facebook page deliberately choose to add the Moogfest page to their Facebook profiles by "liking" it, and to receive Moogfest-related updates, link posts, invites and news.

39. A significant number of Moog Music and Moogfest customers and potential customers who use Facebook elected to "like" the Moogfest Facebook page and, as a result, became Moogfest Facebook fans and receive information about Moogfest.

40. Also as part of its promotional efforts, ACE used the Moogfest Twitter account (using the Twitter name or "handle," "@Moogfest").

41.     By "following" a person or entity on Twitter, Twitter users voluntarily elect to receive (i.e., follow) the messages or "tweets" posted to Twitter by the Twitter user they are following.

42.     A significant number of Moog Music and Moogfest customers and potential customers who use Twitter became Moogfest Twitter followers to receive information about Moogfest.

43.     ACE also promoted Moogfest through the use of the Moogfest website (accessible at the URLs www.moogfest.com and www.moogfest.net) (the "Moogfest Website"). Through the Moogfest Website, Internet users, including Moog Music's customers and potential customers, could find information about Moog Music and Moogfest, and could sign-up to become part of an email mailing list and to receive information about Moogfest.

44.     A significant number of Moog Music and Moogfest customers and potential customers visited the Moogfest Website and signed up to become part of an email mailing list and to receive information about Moogfest.

45.     As a result of the foregoing and the rights granted to ACE by the License Agreement, ACE benefitted from the goodwill associated with the MOOGFEST mark and with Moog Music and used that goodwill to promote Moogfest.

*Moog Music Terminates the License Agreement, ACE Falsely Claims Ownership of Moogfest and Misappropriates Moog Music's Intellectual Property and Goodwill*

46.     On October 30, 2012, Moog Music notified ACE that it was exercising its right to terminate the License Agreement pursuant to the terms of the License Agreement.  Moog Music thus requested that ACE return all intellectual property associated with the MOOGFEST mark.

47.     On or around December 6, 2012, ACE agreed to work with Moog Music to arrange a timeline for the orderly transition of Moog Music's intellectual property from ACE back to Moog Music.

48.     To that end, ACE agreed to meet with Moog Music on December 11, 2012 to discuss the transition of Moog Music's intellectual property.

49.     Instead of returning Moog Music's intellectual property, however, ACE chose instead to embark on a deliberate campaign to steal the intellectual property and goodwill associated with Moogfest and the MOOGFEST mark.

50.     ACE began its campaign on December 10, 2012 – the day before it was to meet with Moog Music to transfer the intellectual property.  On that day, with no notice to Moog Music, ACE issued a press release claiming complete ownership of the Moogfest festival (the "ACE Press Release"), notwithstanding that Moogfest has been an annual event since 2004 – long before ACE became involved.

51.     In the ACE Press Release, ACE purported to "rename" "its" music festival from Moogfest to "Mountain Oasis Electronic Music Summit," for 2013 ("Mountain Oasis"). Specifically, the ACE Press Release stated:

> "AC Entertainment announced today that it will rename *its* multi-day electronic musical festival in Asheville, NC as the **Mountain Oasis Electronic Music Summit** for 2013, continuing to build on the success of the past three years when the event has been produced as *Moogfest*."

> "We have enjoyed booking, marketing, and producing *our* event for our fans …."

> "…AC Entertainment is best known as … the creator of other notable festivals including the Big Ears Festival … and Moogfest in Asheville, NC." (emphasis added)

(A true and correct copy of the ACE Press Release is attached as <u>Exhibit A</u> and incorporated herein).

52.     ACE transmitted the ACE Press Release to multiple media outlets and to people who had opted, through the Moogfest Website, to become a part of a mailing list to receive Moogfest-related information by email.

53. Also on December 10, 2012, without Moog Music's consent or permission, ACE changed the URL address of the Moogfest Facebook page from www.facebook.com/moogfest to www.facebook.com/MtnOasis.

54. As of December 10, 2012, the Moogfest Facebook page had built up 31,776 "fans," *i.e.*, people who were interested in Moogfest and who therefore had chosen to "like" the Moogfest Facebook page.

55. The 31,776 fans of Moogfest's Facebook page constituted goodwill and other rights associated with the MOOGFEST mark and Moog Music's Moogfest festival.

56. By changing – without any notice to the fans or the consent of Moog Music – the Moogfest Facebook page from "Moogfest" to "Mtn Oasis," ACE misappropriated a considerable amount of goodwill that had been built up around Moogfest for the unfair and unlawful benefit of ACE and Mountain Oasis, a new festival with no goodwill at all.

57. ACE's bait-and-switch maneuver on Facebook caused immediate and substantial confusion among Moogfest's Facebook fans. Fan responses included "Is Moogfest over … what is this?" to "RIP MOOGFEST."

58. ACE's Facebook tactic also caused immediate and ongoing damage to the goodwill associated with Moogfest. For example, since ACE released the ACE Press Release, the number of "fans" of the now renamed Moogfest Facebook page have declined for the first time in the page's history, and the number of fans continues to trend downward.

59. At the same time ACE changed the name of the Moogfest Facebook URL from "Moogfest" to "MtnOasis", it also changed the Moogfest Twitter name or "handle" from "@Moogfest" to "@Mtn_Oasis" without Moog's permission or consent.

60. As of December 10, 2012, the Moogfest Twitter account had built 6,301 Twitter followers.

61. These 6,301 followers of Moogfest's Twitter account constituted goodwill and other rights associated with the MOOGFEST mark and Moog Music's Moogfest festival.

62. By so doing, ACE misappropriated the followers of the renamed @Moogfest Twitter account.

63. ACE's renaming of the @Moogfest Twitter handle caused confusion among the followers.

64. ACE's Twitter tactic also caused immediate and ongoing damage to the goodwill associated with Moogfest. Similar to what occurred with the renamed Facebook page, since ACE released the ACE Press Release, the number of "followers" of the now renamed Twitter account has declined.

65. Facebook fans and Twitter followers have considerable value to the businesses that they are fans of or follow.

66. A 2012 study by Forrester Research found that Facebook fans are more likely to buy (and spend more on), consider, and recommend the brands they engage with on Facebook.

67. As a result of ACE's renaming of the Moogfest Facebook page and Twitter account, Moog Music no longer has access to the tens of thousands of users who had affirmatively requested to receive information and updates concerning Moogfest through the Facebook page and Twitter account formerly named "Moogfest" or the list of email addresses of people who signed up on Moogfest.com to receive information about Moogfest.

68. Since December 10, 2012, ACE has continued to disseminate false and misleading advertisements and representations concerning Moogfest, propagating confusion in the marketplace.

69.     For example, in a publicly available interview on December 13, 2012, ACE founder Ashley Capps was asked: "Why did AC Entertainment decide to hold its own festival after Moog Music made its decision to seek another promoter?"

70.     Capps responded: "We're really simply continuing to hold our own festival. We're not creating a new festival – we just had to rename the old one."

71.     Moreover, ACE has continued to post images from past Moogfest festivals on the Moogfest Facebook page, which is now renamed for Mountain Oasis.

72.     By falsely advertising that ACE was "renaming" "its" Moogfest festival to Mountain Oasis, by hijacking Moogfest's Facebook page and Twitter account, and by its subsequent public statements, ACE has deliberately and unlawfully misappropriated the Moogfest intellectual property, fans, followers and customers, and associated goodwill, and confused Moog Music and Moogfest fans, followers and customers, in an effort to unfairly and improperly divert such fans, followers and customers to ACE's new and competing music festival, Mountain Oasis.

**FIRST CLAIM FOR RELIEF**

**(False Advertising under the Lanham Act – Section 43(a), 15 U.S.C. § 1125(a))**

73.     All allegations in the Complaint are re-alleged and incorporated herein by reference.

74.     Through the ACE Press Release and its subsequent commercial advertisements, ACE has falsely described and represented Moogfest as ACE's "own" festival, which it has "renamed" the "Mountain Oasis Electronic Music Summit".

75.     ACE has also knowingly, intentionally, and without authorization used false and/or misleading representations of fact as to the source, nature, and character of the Moogfest festival in order to promote ACE's new, competing festival.

76.     ACE's misrepresentations are material in that they are likely to influence the purchasing and attendance decisions of potential attendees of the Moogfest festival and of Moog Music's customers.

77.     ACE's misrepresentations have actually deceived, and have the tendency to deceive, a substantial segment of their audience, thereby causing customers of Moogfest to believe that Moogfest has been "renamed" as "Mountain Oasis Electronic Music Summit".

78.     ACE made and placed its false and misleading statements in interstate commerce.

79.     As a direct and proximate result of ACE's false and misleading representation, Moog Music has sustained, and will continue to sustain, irreparable injury and harm as a direct and proximate result of ACE's misrepresentations, both by the loss of goodwill associated with Moogfest and Moog Music's products and by the diversion of sales driven by the goodwill generated and associated with Moogfest.

## SECOND CLAIM FOR RELIEF

### (Trademark Infringement under the Lanham Act – Section 32, 15 U.S.C. § 1114)

80.     All allegations in the Complaint are re-alleged and incorporated herein by reference.

81.     Moog Music owns substantial common law rights in, and a federal trademark registration for, the mark MOOGFEST (U.S. Reg. No. 3,714,113) in connection with "entertainment, namely, live music festivals featuring synthesizer music and electronic musicians, and honoring Mr. Robert Moog; [and] providing an online website portal featuring information about music festivals, musical artists and music festival ticket information."

82.     ACE's uses of the MOOGFEST trademark without authorization on the misappropriated and renamed Facebook page and Twitter account and otherwise in commerce to advertise, offer for sale and sell tickets to a competing music festival is and/or has been likely to cause confusion, or to cause mistake, or to create initial interest confusion by deceiving

Moogfest customers into believing that ACE's competing festival, is Moogfest "under a different name."

83.    ACE's bait-and-switch tactics are a deliberate and intentional effort to misappropriate the goodwill and customer support associated with Moogfest.

84.    Moog Music has sustained, and will continue to sustain, irreparable injury and harm, including to its reputation and goodwill, as a direct and proximate result of ACE's infringement of Moog Music's MOOGFEST trademark.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract)**

85.    All allegations in the Complaint are re-alleged and incorporated herein by reference.

86.    The License Agreement is a valid and enforceable contract between Moog Music and ACE.

87.    The License Agreement provides that "[ACE] recognizes and acknowledges that the Mark and all rights therein and goodwill pertaining thereto belong exclusively to [Moog Music], that all rights resulting from its use of the Mark inure to the benefit of [Moog Music]" and that, upon its termination, ACE must "release any right it might have to the internet URL www.moogfest.net and www.moogfest.com."

88.    ACE breached the License Agreement by, among other things, claiming ownership of the Moogfest festival, misappropriating the Moogfest Facebook page and Twitter account, misappropriating the names and contact information of Moogfest customers and potential customers who elected to receive email notifications concerning Moogfest by signing up through the Moogfest Website, and seeking to capture the goodwill and other benefits associated with the Moogfest festival for the benefit of ACE's new competing festival.

89.     Moog Music has sustained, and will continue to sustain, irreparable injury and harm, including to its reputation and goodwill, as a direct and proximate result of ACE's conduct.

## FOURTH CLAIM FOR RELIEF
### (Alternatively, Unjust Enrichment)

90.     The allegations in Paragraphs 1-83 in the Complaint are re-alleged and incorporated herein by reference.

91.     In the alternative to the Third Claim for Relief, and to the extent ACE contends it had no contractual obligation to return to Moog Music all the intellectual property and goodwill associated with the MOOGFEST mark and the Moogfest festival, Moog Music alleges that it conferred a benefit on ACE by permitting ACE to use the MOOGFEST mark and to promote the Moogfest festival.

92.     ACE consciously accepted the benefit conferred by Moog Music, in that it in fact used the MOOGFEST mark to promote the Moogfest festival in 2010, 2011, and 2012.

93.     Moog Music did not confer these benefits gratuitously, nor by an interference in the affairs of ACE.

94.     ACE knew or should have known that Moog Music did not confer gratuitously the above benefits.

95.     Moog Music has sustained, and will continue to sustain, irreparable injury and harm, including to its reputation and goodwill, as a direct and proximate result of ACE's conduct.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Advantage)

96.     All allegations in the Complaint are re-alleged and incorporated herein by reference.

97. Moog Music enjoyed a valid and valuable business relationship with Moogfest's Facebook fans, Twitter followers, and people who signed up through Moogfest.com to receive email notifications about Moogfest. Through Moogfest's Facebook page and Twitter account and via email, for example, Moog Music could disseminate updates, invitations, and advertising to a specific subset of customers who had affirmatively expressed an interest in receiving such materials.

98. Moog Music had a reasonable expectation that its relationships with Moogfest's Facebook fans, Twitter followers, and those who signed up to receive email concerning Moogfest on the Moogfest Website would continue. Prior to the ACE Press Release, the Moogfest Facebook page had never experienced any consistent loss of "fans."

99. ACE was aware of Moog Music's relationship with Moogfest's Facebook fans, Twitter followers and those who signed up to receive email concerning Moogfest on the Moogfest Website.

100. ACE intentionally intervened to destroy Moog Music's relationship with Moogfest's Facebook fans, Twitter followers, and those who signed up to receive email concerning Moogfest on the Moogfest Website by renaming the Moogfest Facebook page as the "MtnOasis" Facebook page, similarly re-labeling Moogfest's Twitter handle "@Mtn_Oasis" and misappropriating the Moogfest.com email list. As a result of ACE's tortious conduct, Moogfest no longer has the ability to communicate with its Facebook fans, Twitter followers or those who signed up to receive email concerning Moogfest on the Moogfest Website.

101. ACE's conduct was without justification. Moreover, ACE employed unlawful, wrongful means to sever Moog Music's relationship with Moogfest's Facebook fans, Twitter followers and those who signed up to receive email concerning Moogfest on the Moogfest Website.

102.   Moog Music has sustained, and will continue to sustain, irreparable injury and harm, including to its reputation and goodwill, as a direct and proximate result of ACE's conduct.

## SIXTH CLAIM FOR RELIEF

### (Unfair and Deceptive Trade Practices – N.C. G.S. § 75-1.1)

103.   All allegations in the Complaint are re-alleged and incorporated herein by reference.

104.   By its false and misleading advertisements that ACE was "renaming" "its" Moogfest festival to "Mountain Oasis Electronic Music Summit", by switching Moogfest's Facebook and Twitter accounts from Moogfest to "MtnOasis", by wrongfully maintaining the list of people who elected to receive email concerning Moogfest on the Moogfest Website, and in subsequent interviews and public statements and marketing and promotional materials, ACE has deliberately and unlawfully misappropriated Moog Music's Moogfest-related intellectual property, customer base, and the associated goodwill.

105.   ACE's above conduct is immoral, unethical, oppressive, unscrupulous, and offends the ethos of the marketplace.

106.   Pursuant to N.C.G.S. §75-1.1, ACE's conduct constitutes an unfair method of competition in or affecting commerce and is an unfair and deceptive act or practice in and affecting commerce.

107.   ACE's conduct was in or affecting commerce.

108.   Moog Music has sustained, and will continue to sustain, irreparable injury and harm, including to its reputation and goodwill, as a direct and proximate result of ACE's unfair and deceptive trade practices.

109.   Moog Music is entitled to and seeks recovery from ACE all damages caused by ACE's actions in violation of N.C.G.S. § 75-1.1 and § 75-16 and to have such damages trebled.

Moog Music is also entitled to and seeks recovery of its reasonable attorneys' fees pursuant to N.C.G.S. § 75-16.1.

**SEVENTH CLAIM FOR RELIEF**
**(Common Law Unfair Competition)**

110.   All allegations in the Complaint are re-alleged and incorporated herein by reference.

111.   By its false and misleading advertisements that ACE was "renaming" "its" Moogfest festival to "Mountain Oasis Electronic Music Summit", by switching Moogfest's Facebook and Twitter accounts from Moogfest to "MtnOasis", by wrongfully maintaining the list of people who elected to receive email concerning Moogfest on the Moogfest Website, and in subsequent interviews and public statements and marketing, ACE has deliberately and unlawfully misappropriated Moog Music's Moogfest-related intellectual property, customer base, and the associated goodwill.

112.   ACE's conduct as alleged above was, on information and belief, intended to and did in fact mislead and confuse consumers in the State of North Carolina.

113.   ACE's strategy is aimed at unfairly misappropriating the benefits of the MOOGFEST mark and the goodwill associated with Moog Music.

114.   ACE's conduct constitutes unfair competition under North Carolina common law.

115.   Moog Music has sustained, and will continue to sustain, irreparable injury and harm including to its reputation and goodwill, as a direct and proximate cause of ACE's unfair competition.

WHEREFORE, Plaintiff respectfully prays for relief as follows:

1.   That judgment be entered in favor of Plaintiff and against Defendant on each of Plaintiff's claims in its Complaint;

2.     A finding that the Defendant committed false advertising in violation of the Lanham Act;

3.     A finding that the Defendant committed trademark infringement and unfair competition in violation of the Lanham Act;

4.     A finding that the Defendant breached the License Agreement;

5.     In the alternative to a finding that Defendant breached the License Agreement, and to the extent the Court finds Defendant had no contractual obligation to return to Moog Music all the intellectual property and goodwill associated with the MOOGFEST mark and the Moogfest festival, a finding that Defendant was unjustly enriched;

6.     A finding that the Defendant tortiously interfered with the prospective advantage of Moog Music;

7.     A finding that Defendant's conduct constitutes an unfair method of competition in or affecting commerce and is an unfair and deceptive act or practice in and affecting commerce in violation of N.C.G.S. §75-1.1;

8.     A finding that Defendant committed unfair competition in violation of the common law of North Carolina;

9.     The Court enter an order for a preliminary injunction and then enter an order for a permanent injunction both enjoining Defendant and its officers, directors, employees, agents, and all those in privity, concert, or participation with them, from:

     (a)     Making false of misleading statements or representations about Moogfest and/or Moog Music, including, without limitation, that the "Mountain Oasis Electronic Music Summit" (or any other event produced by Defendant or any of its owners or agents) is Moogfest under a different name, or that Moogfest was created or founded by Defendant or any of its owners or agents;

(b)     Using in commerce the MOOGFEST mark or the MOOG mark for or in association with an electronic music festival pursuant to 15 U.S.C. § 1116;

(c)     Using the Moogfest Facebook page (now renamed www.facebook.com/MtnOasis);

(d)     Using the Moogfest Twitter account (now renamed @Mtn_Oasis); and

(e)     Using any other social media or mailing list of users who signed up through Moogfest.com, Moogfest.net or any Moogfest branded social media platform to receive information concerning Moogfest;

10.     The Court enter an order for a preliminary injunction and then enter an order for a permanent injunction requiring Defendant and its officers, directors, employees, agents, and all those in privity, concert, or participation with them, ordering them to relinquish all control of, transfer, and facilitate the transfer of control to Plaintiff of:

(a)     the Moogfest Facebook page (now renamed www.facebook.com/MtnOasis);

(b)     the Moogfest Twitter account (now renamed @Mtn_Oasis); and

(c)     all mailing list of persons who signed up through Moogfest.com Moogfest.net or any Moogfest branded social media platform to receive information concerning Moogfest;

11.     That Moog Music be awarded damages as a result of Defendant's wrongful conduct;

12.     That Moog Music be awarded (a) any damages sustained by it as a result of the acts alleged herein, (b) Defendant's profits, (c) the costs of the action, and (d) that the Court treble or otherwise increase Moog Music's damages pursuant to 15. U.S.C. § 1117, together with interest, including pre-judgment, as fixed by the Court;

13.     The Court treble the compensatory damages awarded with respect to the Sixth Claim for Relief pursuant to N.C.G.S. §75-16;

14.     The Court award the Plaintiff its costs and attorneys' fees pursuant to N.C.G.S. §75-16.1, *et. seq*., and applicable law;

15.     The Court tax the costs of this action against the Defendant;

16.     For a trial by jury on all issues so triable; and

17.     The Court grant the Plaintiff such other and further relief as it deems just and appropriate.

This the <u>9th</u> day of January, 2013.

 /s/ Christopher M. Thomas
Christopher M. Thomas
N.C. Bar No. 31834
Matthew H. Mall
N.C. Bar. No. 36914
PARKER POE ADAMS & BERNSTEIN LLP
Wells Fargo Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
(919) 835-4626
christopherthomas@parkerpoe.com
matthewmall@parkerpoe.com
*Counsel for Plaintiff Moog Music, Inc.*
